This is the time set for arguments on bonk in the case of Young v. Hawaii. Today we'll be using a procedure we've been using all week for our human bonk cases. I will allow each of the attorneys to argue for about three minutes, and then I will call on judges to ask their questions. And if you are not speaking, we ask that you mute your mic. All right, Mr. Beck, you may proceed. Good afternoon, your honors, and may it please the court. My name is Alan Beck. I'm counsel for the plaintiff appellant, George K. Young, Jr. I would like to reserve three minutes for rebuttal. As a preliminary matter, while this court sitting in bonk is not bound by its previous decisions, this court sitting in bonk in Pruda found the right to concealed carry is not part of the second amendment right, simply left the question of open carry unanswered. That open carry question is squarely before this court now. Mr. Young challenges the constitutionality of the defendant's handgun licensing scheme for three core reasons. First, HRS 134-9 basically violates the second amendment because statute prohibiting the average law abiding person from carrying a handgun self defense by prohibiting open carry would find an exceptional case for concealed carry. The result is the same if the court were to adopt the state's alternative reading of the statute, because even under this reading, the statute extinguishes the rights of an average law abiding person, such as Mr. Young, carrying a handgun outside the home for self-defense. Secondly, the County of Hawaii's implementation of 134-9 violates the second amendment because it constitutes a de facto ban on handgun carry outside the home. We know this because the published regulations of the County of Hawaii only allows the issuance of open carry permits to security guards and county counsel conceded at the panel hearing that the county has never issued a This concession is supported by the official state reports, which show the same. Noteworthy, starting in 2018, the state removed the term concealed from reports, and thus we know now defendably that in 2018-2019, in all of Hawaii, including the county, not a single private citizen had either an open or concealed carry permit. This pursuant to more is unconstitutional. Finally, Mr. Young's due process and second amendment rights have been violated because the chief has been granted unbridled discretion to deny handgun carry permits. There's a lack of fair notice of what is required to qualify for permit. There's no appeal process. The threshold questioned each of these issues is whether the second amendment right applies outside the home to self-defense. Mr. Young submits that it does. This has been the holding of every circuit and state supreme court rule on this issue. This court should not deviate, but find the same. This is because the core right discussed in HALA is self-defense. As Judge Posner said more, self-defense can occur just easily outside the home. It's inside the home. And this was followed by the DC court's opinion ran. Pursuant to this circuit's precedent, because the second amendment right extends outside the home, the licensing scheme extinguishes the right by banning Mr. Young's right to arm self-defense. This court should apply a categorical approach and find defense licensing scheme unconstitutional. Additionally, find that Mr. Young's due process rights were violated. Thank you, counsel. The first question will go to Judge O'Scanlan. Counsel, you indicated that no license has been issued to any security guard or a similarly engaged person. What is the authority for that? And to what extent can we take that into account in this proceeding, given the status of where we are? On page 16 of my client's complaint, he indicated that the only way to qualify for a permit is if he is a, if he is, if you are a security guard or otherwise similarly situated professional. And that was indicated in the briefing. Additionally, this court can take judicial notice of 20 years of state AG reports, which indicate that zero permits have been issued. And finally, at the panel hearing, a counsel for the county indicated that there had been zero permits issued. And because the county regulations demonstrate that open carry permits are only, are reserved for security and other similarly situated individuals. We know that based upon that concession, that zero permits have been issued by the county, your honor. Thank you. Judge McKeown has the next question. Yes. Good afternoon, Mr. Beck. I have a preliminary question with respect to scope and then a follow on question. You appropriately noted that Peruta left open the open carry issue before the court, but then in your petition for rehearing in bank, and then today, it appeared that you're asking us to find the entire scheme unconstitutional. So are you asking us to overrule Peruta with respect to the concealed carry? We're not, your honor. In Peruta, the court found that there's no freestanding right to concealed carry. And here our client simply wishes to carry in some manner. He would be perfectly happy with an open carry permit. However, if this court did find that because he's alleged he wants some form of carry one way or another, he also would be perfectly fine if the, if this court found that rather than having a freestanding right to concealed carry, he would be open to carry concealed as a reasonable alternative pursuant to the language in Jackson v. San Francisco. All right. Well, with respect to open carry, what is your position of whether the availability of concealed carry licenses, which are not subject to some of the same criteria as open carry, how does that factor in, in your view, to the level of analysis we should use with respect to open carry? In light of the fact that my client simply wishes to carry in some manner outside the home, and he is, and here, because concealed carry is completely a, as there's a de facto ban on carry by the county, we find that the, if, if we were, if concealed carry were freely given, we would not be here as a practical matter. My client has made perfectly clear with his complaint. He simply wishes to carry either concealed or openly. And I think that it, the fact that there is a, that there's no avenue to exercise right, either concealed or opening, makes this, makes it so that this is a situation where the right is extinguished pursuant to this court's precedent. And we should apply a categorical approach in striking the law to the extent that it would be appropriate for, for, for, for, for carry, Your Honor. Thank you. Judge Fletcher. You're still muted. Oh, yeah. No, I think Judge Wardlock comes before me. Yeah, so she, she, she elected not to ask a question this round. Oh, okay. A question then, um, what record, if any, was made in the district court with respect to the granting of concealed carry permits and open carry permits? I understand you're wanting us to act, take judicial notice and so on. Was this a disputed question or was this a question as to whether any record was made in the district courts? Um, if, if I understand the court's question, my client has alleged in his complaint that the only way to qualify for a permit is to be a security guard. Uh, in the, at the very least in the county. Um, and since we're before here on a rule 12 dismissal, uh, the, um, the allegations need to be accepted as true. Um, and beyond that, there hasn't been any discovery or any, and my client has not been, had a opportunity for, uh, any sort of fact finding, Your Honor. Given your answer, you may not want to answer this next question, but would it be your client's position that if concealed carry permits or open carry permits were granted to private individuals, but very strictly with a requirement that there'd be some immediate danger and some requirement for a self-defense, would your client's view be that that violates the second amendment? Yes, it would be pursuant to the, uh, uh, DC's court's decision in, uh, RAN. Uh, crime is not something that, uh, individuals can predict and, uh, a law that restricts the, um, uh, the average law abiding person that, uh, which is the group that was protected in Heller, um, would, uh, is unconstitutional. And here the statutory scheme, uh, even if it, uh, allowed for the granting of some individuals, which it doesn't, uh, would still be unconstitutional because it would still extinguish the rights of the average law abiding citizen to arm self-defense, Your Honor. Okay. Thank you. Judge Clifton. Still got too much noise in the background. So go on without me. Very good. Um, Judge Biby. Uh, counsel, I'd like you to assume the following for purposes of my question. Um, I'd like you to assume that at any critical time in the history of the second amendment, that is during, or during a period of English common law in the colonial era, as of 1789, 1791, 1868, and at any time during the modern era, that, um, that the record in the states of state regulation of, um, of guns was in equipoise, that is that about half of the states or half of the counties in England, um, had, uh, had a free right to, uh, open carry. And about half of them had some restrictions on open carry. Who wins under that scenario? Um, here, um, if it's a, um, uh, half and half, uh, situation, I, uh, still would believe that, uh, the per, the, uh, group that, um, has ultimately be bound by Heller, which has found that the, um, uh, right to self defense is what's protected. And in, um, in Heller, the, uh, right to self-defense is, uh, was not restricted just to the home. That's a simply the area which the DC handgun ban was, um, uh, found and we were required by precedent to find that, um, um, that, uh, that right, um, has be, has be allowed to exercised, um, wherever individuals may reasonably find themselves. Your position today is that all of the history that's been mustered here, that was mustered in Peruta or that was mustered by various, uh, amici and parties in this case, is there relevant because Heller has decided the question of what the history, what the history tells us? Um, uh, I, um, as a, um, practical matter, um, I mean, that is not what the history indicates. However, I do need to address the court's hypothetical rather than what the actual history is. So, um, what I would say is that, um, uh, we would look to, um, in, we would look to what the framers thought at the colonial period was the, uh, enumerated what was the right they were attempting to incorporate, and we, we'd have to that they were trying to adopt. And I don't believe that's, that it's quite possible to simply to look at, uh, you know, we have 50 here, 50 here and, uh, uh, make an appropriate analysis. I, I'd have to look at, uh, uh, what those actual, um, um. Okay. So I want, just want to make sure that I'm clear because this, your answer here to my second question feels like it contradicts your answer to my first question, then Heller doesn't absolutely answer this. And we do have to look at the historical record. Is that, is that correct? Um, Heller has already, we believe that, uh, Heller's already answered the, uh, right at issue. And that is to self-defense. Uh, the historical record may, uh, determine the scope of the right outside the home, uh, as to certain enumerated areas, but to the that there is a right to self-defense that can be found both inside and outside the home, we do believe that Heller made very clear they have a right to self-defense, that's simply an enumerated right. And, uh, maybe, um, when dealing with something other than what we allege is a complete ban, uh, history might be a, uh, a better, uh, tool in order to, um, So what is your response then to the, to the evidence that, um, that many states had a, had some kind of a ban on open carrying that is carrying in public because it was disruptive to the public piece. Uh, I, uh, there is, um, very little historical evidence to show that at the colonial period, there was only one, uh, colonial restriction on, uh, carry. And that was for pocket size or concealable, uh, uh, size handguns. That was a New Jersey statute. And even then, um, long arms and larger pistols were still allowed. So the history just simply does not indicate that, uh, during the colonial period, there was any type of, uh, restriction that would match that scenario, your honor. Okay, thank you. Judge Callahan. Yes. Um, if the right to carry firearms openly is a core second amendment right, what limits can a state place, then place on carrying firearms? What kind of good cause regulations would be constitutional and what kinds of good cause restrictions would be unconstitutional? Well, uh, your honor, we do not believe that any, uh, unconstitutional good cause requirements would be constitutional to the extent that we're discussing a scenario that, uh, that restricts, uh, the right to carry to a small subset of people that, uh, are unable, that, uh, that, uh, have some sort of arguably heightened need. However, there are restrictions that, such as training requirements. We certainly think would be in line with the right self-defense. There would be, uh, restrictions possibly on census of places, which was discussed in Heller that, uh, likely would survive constitutional muster. But, um, uh, for all the reasons the DC court struck down the decision in Wren, we do not believe that, uh, good cause teams in general, which extinguish the average law abiding person's right to self-defense can survive constitutional muster. However, I would like to reiterate that that is not the situation that we see right here. This is a licensing scheme that results in a de facto ban on any form of carry due to the issuance right. And additionally, um, it confers the, um, uh, licensing official unbridled discretion, um, and, uh, violates due process, which is in a posit to any schemes being evaluated by a federal circuit court, your honor. Thank you. Judge Okuda. I have a few questions, um, following up somewhat on Judge Bivey's questions. I, I'm not a historian. So it's, it's always been a little bit confusing to me that the Supreme Court is making me read all this history. And it seems like the history as, as Judge Bivey indicated, you can prove almost anything with it. And I'd be willing to say it's an equipoise, but if the history is an equipoise, um, and, and, um, there are a number of, um, uh, both second amendment and first amendment cases saying that the, um, the government would have the burden of proving that, um, uh, the law is valid and would have to prove, uh, and would have to carry that burden of if the law, if the history is an equipoise, uh, does that mean that we, um, we should say it favors the, um, uh, your client? And if so, does that get us anything other than whether this is a, um, the right to carry outside the home is a core second amendment, right? Or does it go further? Um, I, I, I would do my best to answer your question. However, I do not know what the word equipoise means. Uh, that they're even, basically. Oh, even. Thank you. Thank you. Thank you, Your Honor. Um, well, I, I believe that, um, if, uh, I, I, I, uh, believe that, uh, I've read a term called, uh, law office history and, uh, uh, the issue with the history that gets mustered by two sides that have, uh, an adversarial, uh, that have a vested interest in the history is oftentimes that history gets, uh, um, gets muddled at what we do now is that it's an, that there's a core right that was established by the U.S. Supreme Court and that core right is self-defense. And, uh, if, um, a, a ban and it's, it's enough, I think after, you know, the past decade of, uh, jurisprudence, we can establish that if it's a complete ban on the core right, there really isn't a need to go, to do a deep dive in the history because that history was already done in Heller to establish that the, there's a fundamental right under the second amendment to, um, to self-defense that's, um, and, and that's the core. And then, uh, afterwards, uh, maybe establishing a scope, uh, of that in certain particular narrowly tailored areas or small areas might be an appropriate, uh, use of history for scenarios that have not already been established by Heller. But, um, here, because we're dealing with, uh, what ultimately is a ban on carry, I mean, it's just not, that's already been established by the Supreme Court, uh, to a large degree as, uh, being contrary to the right that, uh, was being evaluated there. Well, I understand that, uh, your position is that carrying a gun outside the house is part of the core second amendment right. Um, uh, uh, does the government agree with that? I thought they were, they disagreed and said it wasn't a core right. While the, uh, the government has not, uh, they disagree with the fact that the, uh, that there is a core right to arm self-defense outside the home, but at the very least, uh, and, and this, um, uh, in their in bonk briefing, I did not see where they disputed that the right to arm self-defense applies at least to a degree outside the home. And, um, while they didn't concede the point, they certainly did not dispute our position that the right to arm self-defense applies outside the home, at least to some degree. And based upon that, it's inconceivable that there can be a licensing scheme, which, um, which, uh, results in a de facto ban on carrying your honor. And I believe that that's enough. So you're saying, even if it was intermediate scrutiny, this, this, um, this law would fail. Am I understanding that right? Uh, yes, Your Honor, without, without conceding the point, which we believe the categorical approach should apply. However, applying any level of heightened scrutiny, which is required by Heller, uh, there simply cannot be a, uh, there can't be a right and have no one be able to exercise it. There also can't be a reasonable fit between, um, the right and, um, you know, having a situation where no one's being issued permits, but in theory, uh, the chief could have, um, you know, um, unbridled discretion between, uh, as to who he wanted to issue, if he decided that he ever was going to issue. Thank you. Judge Friedland? So you have mentioned a procedural due process objection here, and I would just like to ask you what it is you would prove if you had more procedures? Because if the state's interpretation of the law is what we accept, and we think this is a good cause law, it seems like you hadn't alleged that your client had good cause, and that was in fact, your complaint here. So I'm wondering what it is you would be trying to prove with more procedures. Well, um, that sort of goes to the core of the due process argument. Uh, outside of the fact that the chief has unbridled discretion, the licensing scheme, at least promulgated by the county, does not give my client fair notice of what would need to be put on a, uh, application in order to qualify for this, for a permit, because there is no promulgated guidelines that, uh, at least for our private citizens. And I had to direct this court to, uh, NAWSI v. Fair Housing, which is a ninth circuit case that, uh, found that, uh, section eight beneficiary recipients, um, had a, there was a due process violation because they were not given, uh, fair notice of, uh, what need be done to, uh, uh, renew their benefits. And, uh, uh, similarly, my client wasn't given fair notice of, uh, what, uh, um, what, what, uh, what we need to, um, uh, put down and even in... So, so can we just, for purposes of, uh, thinking of this hypothetically, at least, what if the state said you need to give a reason that is beyond the, um, interest in self-defense that everyone has? Could your client give a reason beyond that? Um, I, I do not know. I, uh, I know what he alleged in the complaint and he alleged that, uh, he wanted to defend himself and his, uh, uh, family. However, uh, that's just simply the allegation that's been made within his pro se complaint and, uh, uh, beyond that. So if we don't know the answer to that question, then how does your client have or any kind of standardless licensing challenge? It seems like really his only standing is to argue about whether good cause requirements are okay or not. Well, I, I had, uh, direct this, uh, court to, um, uh, two cases, one in, uh, the, uh, Ninth Circuit, which, uh, it's a Hawaiian case, which I cited to, um, come, excuse me. Kahumanu? Yeah. Yes, Your Honor. So that's a First Amendment case. That was my next question. Are you making a First Amendment argument here or, or are you only making a Second Amendment argument here? Uh, we're, uh, well, we're making a, we're just making a Second Amendment and a 14th Amendment due process argument. However, our position is, is that in Jackson v. San Francisco, uh, Judge Ikuda found, or the Ninth Circuit, I mean, uh, found that this court should make, um, should apply First Amendment principles to, uh, Second Amendment jurisprudence. And thus this court can look to its First Amendment jurisprudence along with Supreme Court jurisprudence to find that there is a, um, both a Second Amendment and a due process violation. Um, in that case, there is a, um, uh, the court found that it was not necessary that, uh, the, uh, that the, um, uh, the, the licensing official in Hawaii had ever actually used his, um, his, um, his authority in a manner which, uh, uh, might, um, which was, which, uh, which might, uh, which would be unfair. It was just simply enough the statute as implemented conferred unbridled discretion, uh, to him. And that alone was unconstitutional per se. And I also would direct this court to another case recited, uh, by the U.S. Supreme Court, um, it was, uh, Lake Shore, um, Lake Port, Your Honor, and the U.S. Supreme Court found the same. It's the existence of the unbridled discretion alone, which is enough in order to challenge the, uh, uh, a, uh, licensing scheme, and there's no need to find that it's been applied to the applicant, uh, in order to, um, uh, confer, uh, in order to be properly challenged, Your Honor. Thank you. Judge Nelson. I just have one question given the time. Do you, you mentioned in your opening remarks, you are raising, uh, your second argument is you're challenging the implementation is, do you read that to be an as applied challenge separate from a facial challenge? And if so, what is your position that that argument has been preserved and is before us? Uh, it has been preserved, Your Honor, because at every stage in these proceedings, uh, my client, while pro se, raised it and then I did in my opening brief, um, in my client's, uh, opposition to the state's motion to dismiss this on page one, I'm, uh, um, he, uh, stated that he was a challenge in this exceptional case, sufficient urgency requirement on its face and, or the application thereof impairs, uh, the second amendment right to arms. And, uh, and he goes on, um, I don't, for, uh, there's quite a few more references here for, uh, uh, on, uh, both on page two, he, uh, says given the existing facts, the actions of defendant Kouboujeri, his rights were violated, uh, defendant Kouboujeri has taken that authority and arbitrarily denied, well, I, I don't want to take up too much of the court's time, but also in, uh, the point is he, if you look at it, uh, quite a few times, he references the as applied challenge and then in my opening brief, uh, the very first section of the, uh, of, uh, of the section, uh, may I finish my response? Judge Thomas. Uh, um, quickly. Uh, yeah, sorry. Um, the, I, uh, say that, uh, the challenge we're making is pursuant to chapter 91 of the, um, uh, of the HRS. Uh, this has been implemented and we're challenging this as applied by the County as facially. And that's the very first section of the argument section. Uh, you're on. Thank you, Judge Thomas. All right, very good. Uh, we will hear from the employees. Thank you, Chief Judge Thomas. And may it please the court, Neal Katyal for the state and County of Hawaii. Hawaii's law, which has restricted the open carrying of firearms continuously for the last 168 years is constitutional. There are broadly speaking, three types of regimes across the country. First, individuals can openly carry firearms virtually anywhere and anytime. That is what Mr. Young says the second amendment requires. Second, individuals can't openly carry firearms anywhere and anytime. That's what Mr. Young claims Hawaii law imposes. And third, individuals can carry firearms if they have good cause. That is what Hawaii's law actually is. Once you see that the steam behind this challenge falls away. Hawaii's law is squarely rooted in a long historical tradition going back seven centuries. That tradition shows that carrying firearms in public without good cause has never been part of the right to keep and bear arms. The colonists brought these laws with them to America and they were enshrined in many state laws, both before and after the founding. Seven judges in Peruta recognized that concealed carry restrictions were constitutional. And the case here is stronger as unlike concealed carry, these good cause restrictions on open carry were universally upheld. This is Peruta plus. Indeed, 30 states had good cause restrictions on open carry in the early 20th century. These laws were upheld by every court to consider their constitutionality at the time. It's telling my friend, Mr. Beck, can't cite a single case to the contrary, not one. That judicial reluctance is not surprising. As Judge Wilkinson of the fourth circuit put it, it's not possible to quote, draw from the profound ambiguities of the second amendment, an invitation for courts to preempt this most volatile of political subjects and irrigate to themselves decisions that have been historically assigned to other more democratic actors. As he later said, the states are at their height for a miscalculation means unspeakably tragic acts of mayhem. That's the answer to Judge Akuta's question. If there is, we aren't at Kapoiz and we don't think we are, but even if we are, we should win. Indeed, there are three separate ways that we should win. My friend has to defeat all of them. First, does the historical understanding of the scope of the right prohibit good cause restrictions like Hawaii's? The answer is no, starting in England in 1326 and going forward. Second, independently, is a good cause restriction longstanding? To use Judge Bybee's words in Pena, longstanding accepted regulations may come from the early 20th century and need not trace the roots back to the founding. Here again, a clear consensus emerged, 30 states in the early 20th century. And third, does the statute meet a level of scrutiny? We think it does, whatever that level may be, of scrutiny may be. So perhaps the most important place to begin is the text of the statute itself, which is found in our appendix to our MBAC brief at page eight. And that clearly says and lays out this good cause restriction that we have isolated. And this is not a complete ban. It enumerates a number of circumstances. My friend on the other side has said, and I wasn't exactly clear, but it sounded like Judge O'Scanlan, either he or you had the impression that he was arguing that even with security guards, permits hadn't been issued. And that's, of course, not right. Over a thousand have been issued in the last five years. Now, to be sure, he makes much in his facial challenge of trying to argue  I think that's his best argument. I think it's got a bunch of problems though. The first problem is that the plain text controls the interpretation of the law. That's what the Hawaii Supreme Court has said repeatedly. And what Judge Nelson, to answer your question to my friend on the other side, what you said in your majority opinion in Cavalry Chapel, you said when reviewing a facial challenge, we're limited to reviewing the text of the statute, which means here, the text is clear. That's a good segue because Judge Nelson has the first question. Well, I wanted to start off. I know you're anxious to get to the statute, but can we start with the regulation because the regulation only applies in one county, but it's this county, so presumably he was subject to it. Would you agree that the County of Hawaii's regulation is unconstitutional, separate and apart from the statute? To the extent that the Hawaii regulation says that it's only for security guards, it's just flatly inconsistent with Hawaii's text of the law and that would control, and indeed Hawaii itself, the County of Hawaii is before you. In this very case, they've signed the merits brief along with the state and said, that is the interpretation I'm giving you, which is that it's not limited to security guards by its text is what they think. Well, what's your position for, point me to somewhere in the text that it's not limited to security guards. Sure. So the text, and as I said, that's at page eight of the appendix to our own bond brief, that the text of the statute. No, sorry. The text of the regulation, setting the statute apart, because I agree with you that the statute is different, but the regulation for the county, which is what only security officers can receive licenses. Yeah. So the extent that it says that we think that that's just flatly the wrong way of interpreting Hawaii law. That's what our, that's fine. So you would agree, you would agree that, that, that, that the regulation itself is unconstitutional, meaning the second amendment would not permit that regulation. Your Honor, I wouldn't even go to the constitutionality. It's just flatly inconsistent with what Hawaii's state law is. And so to the extent there's any doubt about how you read the statute, I think Ashwander says you read the statute to avoid a constitutional difficulty. And so my friend has some arguments on the other side about how, well, it maybe is limited to security guards. To the extent there is any doubt, if you're an equipoise as to that, Ashwander is clear that the right thing to do is not to say that there's a constitutional difficulty, but instead to just read the statute the way that the text just Okay. You didn't cite to Wren or Moore. If we, if I were to agree with the position that Judge Griffith laid out in Wren, in his majority opinion in Wren or Judge Posner laid out in Moore, is your position, can you distinguish this case from those? Absolutely. So, I mean, I think the first thing is, is obviously we think, and there's overwhelming historical evidence at every relevant time period, that the way that the Wren majority interpreted the history is wrong, at least with respect to open carry. No, I understand you think it's wrong, but my position is, can you distinguish the case if that were the reasoning, if I were convinced by that reasoning, could you tell me why that reasoning does not control in this case? Yes, because here you are dealing with a good cause restriction on open carry. And at every relevant time period, whether you look at England in 1326, you look at the colonial era, you look at 1865, you look at 1900, that independent test for longstanding, all of those, all the relevant evidence is so far in our favor. Judge Bybee asked if we were in equipoise as to this, what would it mean? And the first thing to say is it's just not equipoise. And it's very hard for me in a 30 minute argument to take you through all of this since Judge Okuja, I think, outlined in her questions to my friend. But if one reads the Everytown brief and the Historian's brief and our brief, and you drill down and ask the question, is a good cause restriction on open carry, not a flat ban, but a good cause restriction, is that something that has historical precedent? We think the overwhelming answer is yes, at every relevant time period. Sorry to cut you off, but I just want to get one more question in and hopefully it's quick. Do you agree that there's an as-applied challenge pending here? And if so, shouldn't we send that back for more discovery? We don't think that there's an as-applied challenge. In his motion to dismiss opposition at page three, he called this a facial challenge. I don't think that it was preserved even in the district court and certainly not in the Ninth Circuit before the panel. And indeed, even today before Judge Friedland, in answer to Judge Friedland's questions, Judge Friedland asked, you never alleged your client had good cause, and he essentially agreed and didn't push back. And indeed, when there was a follow-up question, tell me why your challenge is different than every other ordinary citizen, he, I think, didn't try and push back and say, yes, I have some sort of good cause or something like that. So as this case comes to this court, I think you have to take as given that this is a challenge to the overall statute. And what does the work in his argument is, I think, really, you know, or what makes it, I think, sympathetic is this idea that, well, maybe someone truly does have good cause, maybe there is some extreme case, and Hawaii's not granting that license. We don't think there is such a set of cases. He's certainly not pointed to any except his conclusory statements just now. And that's certainly not enough, I think, to survive Iqbal and Twombly. All right. Thank you. Judge Friedland? As I understand it, the Attorney General of Hawaii has now issued a formal interpretation of this law. I'm wondering if you could tell us, as a matter of state law, who is bound by that? Are the county prosecutors bound by that? Are the police chiefs bound by that? Well, I think that the Hawaii Supreme Court has said in the Capo case that it is at least highly instructive to interpreting the meaning of the statute. We think, Judge Friedland, you don't even have to get there because the text of the statute is clear. And you certainly have before you here, even if there's some daylight between whether it's a formally binding regulation on the counties or not, you have all four counties in this very case saying the Attorney General's opinion and the plain text of the statute reading that we're saying is exactly how they interpret it. Three have filed an amicus brief before this court, and the fourth is a direct party in this litigation. Thank you. Judge Akuda? Could you just help me understand where your good cause argument fits into our structure of our framework of analysis? So are you agreeing that the bear arms part of the Second Amendment has some meaning so that there is some Second Amendment right to bear arms outside of the House? We do, Judge Akuda. We take very seriously, to use Judge Callahan's dissent in Peruta, that we don't want to treat the Second Amendment as any sort of second class right. So we have said in our brief at page 15 is explicit, and indeed the panel opinion and also page 15 of the addendum is specific, that as this case comes to the court, assume that there is a right to bear arms, when bear means carry, and that it applies outside the home. As my friend just conceded, he said, if the historical record may determine the scope of the right outside the home. Let me get to the historical questions. So the history, which as I mentioned, I find very ambiguous, but your argument as the history is merely that this right to bear arms is not a core right, and so it can be restricted. Is that correct? No, Your Honor. We're saying that the right to bear arms, you can even see it as a core right, but it's always been subject to a good cause restriction at every time period. We review in our framework, once we decide whether the Second Amendment applies at all, then we decide whether it's a core that the particular law infringes on a core of the Second Amendment or not. Are you saying that this Hawaii law infringes on a core of the Second Amendment or not? I'm saying that it's a more granular analysis to use the language of Heller. You know, Heller said, look, that there is a Second Amendment right to keep arms in the home is core, but, quote, the right secured by the Second Amendment is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. And so why should we be applying strict scrutiny if this is part of the core Second Amendment right? No, Your Honor. In this historical test, both in Heller and in Peruta, you don't look to scrutiny. You ask yourself, and my friend on the other side agrees with me. He said the right way of thinking about it is look to history to determine the scope of the right. OK, well, I have to say I don't really care too much about what Appellant is saying because we have to get our jurisprudence correct. And are you then saying we should follow Justice Thomas and looking at history, text and tradition and not use our tiers of scrutiny? No, Your Honor. I'm saying to do exactly what Heller and Peruta, the majority, did both times in which there's you don't have to get to intermediate or strict scrutiny. There's two independent historical tests. One to ask, is there a kind of long tradition starting in Anglo-American history of the regulation like the one at issue? And second, independently, is there a 20th, early 20th century analog, that longstanding prong? Either of those don't land you in the realm of scrutiny at all. That's how you define the right. One last question. If we do apply strict scrutiny because we find this restriction to infringe on the core Second Amendment, would this law survive strict scrutiny? We do think it would. We think that you'd want to apply intermediate scrutiny for all the reasons the First, Second, Third and Fourth Circuits have said. But even if you applied strict scrutiny, we do think that this law, which is a good cause restriction, is constitutional even under that standard. Thank you. Judge Callahan? Yes, Mr. Cattell. Is a longstanding good cause regulation always constitutional? I guess to me that a regulation is longstanding doesn't necessarily mean it comports with the original meaning of the Second Amendment or with Heller for that matter. So could you answer that for me? Yes, our position is not that it automatically makes it constitutional. I think Judge Bybee, in his Pena opinion, went through this in some detail. It makes it presumptively lawful. That presumption can be overcome. We don't think that here it's even close, that that presumption has been overcome to invalidate this law, which has been around for 168 years and mirrors the laws in many other circuits, in many other states. And if you adopt my friend's interpretation, you're condemning not just a lot of contemporary laws, but even 30 laws at the time of the 20th century, at the early 20th century. And that I just don't think could be a very persuasive reading of what the Constitution requires. That magically, all of a sudden, all of these different laws, both today and at the turn of the last century, were now magically unconstitutional. Thank you. Judge Bybee? Thank you. I don't I don't have any questions at this time. All right. Judge Clifton? Judge Fletcher? At this time, thank you. Judge Wardlaw? Judge McKeown? I don't have any questions at this time. Judge O'Scanlan? No further questions, thank you. All right. You still have a few minutes if you want to make any additional points. I'd just like to make one point in response to Judge Bybee. Judge Bybee, you asked my friend on the other side, if the history is in equipoise about these longstanding regulations, these early 20th century ones that you adverted that you'd written about in your opinion, what do you do? And I want to just give you four responses to that question. The first is, obviously, we don't think the history is in equipoise. 30 different states at the turn of the 20th century had good cause restrictions that were very much like Hawaii's. Second, the felon laws and the mentally ill laws that the court in Heller talked about as longstanding weren't around in half the states at the time of the early 20th century. Indeed, they weren't in any states. It was only in the federal government. The states came quite a bit later. But nonetheless, the Supreme Court in Heller called those longstanding. Third, the opinion in Heller, too, for the D.C. Circuit called the registration laws longstanding, even though they weren't in nearly half the states at the early 20th century. And fourth, and I think the most important point on the history is this, both on longstanding and that first prong of going back to the Anglo-American tradition, it's really telling to me that, you know, there aren't states saying that there was a right to openly carry firearms if you lacked good cause. He can take potshots at a couple examples here in the area called some surety laws, some terror laws on the Statute of Northampton. We think all of those are wrong for the reasons that those distinctions are wrong, for the reasons our brief and the Everytown brief and the historian's brief make clear. But at the end of the day, even if you credit all that, you're still left with an exactly what the Hawaii law does here, which is to have a restriction on open carrying of firearms for good cause. It is not a flat ban. The text doesn't say it's a flat ban. The attorney general's opinion says it's not a flat ban. And so for those reasons, we think this particular statute is constitutional under the  But we think that the panel's interpretation of what Hawaii law is, was wrong for the reasons the text says and the attorney general's opinion says. And so in that sense, this case is very much like the Nordyke versus King case from 2011, which all three members of the original panel are here on the Samban Court, in which there was an interpretation of the law offered by the county. They went back and thought about it and changed their interpretation. And came and said that isn't the way gun shows are permitted on county grounds. And that led the court en banc to reverse the panel decision. We think the same result should apply here. We do admit there was some unclarity by the county attorney before the panel. But as this case comes to this court, the record is clear and the text of the law is clear. Thank you. Can I ask a question? Certainly. So, Mr. Cagle, I'm just curious about the origins of the Hawaii law. At the time that Hawaii adopted this, was it the 1840s? 1852, your honor. 1852. And what was Hawaii's status in 1852? Yes, it was separate and independent. It was 1898, I believe, that they became. 1898 is the date. And Judge Clifton can correct us on any of this history. And do we know where the law came from? Was it adopted from British law? Was it adopted from American law? I don't think we know the exact tracing of the law, but the language, which is, I think, the appendix to our brief around page five, has the original text of the 1852 law. And it does actually mirror very much other laws at the time, the very language it used. And it certainly changed a bit over time. But even all those changes, like 1927, you can see them all. They're in the addendum to our brief. They use some different words, but they have essentially always meant the same thing. It's a good cause for restriction. Thank you. Hey, does anybody else have a question? If you do, raise your hand. Very good. Thank you for your argument and we'll hear rebuttal.  OK. Thank you, your honor. Hawaii is an outlier jurisdiction. As for the county, in 2011, when my client actually applied for his permit, that is when those were the promulgated regulations. The county was actually the one that submitted the regulations in this litigation. And I was representing representation to the court that that was what their standards are. He has never, the county has never actually rescinded those regulations, even if they did, it wouldn't matter because my client has a request for damages in here. Thus, he would still have standards to pursue his claim. And just simply the fact that in 2018, years after the litigation, my client applied, the state is trying to take the position that this is not what the county actually does, despite the fact that this is their promulgated regulations, they've represented to the court is what they are, just can't really be taken as seriously. And the attorney general's opinion, as we cited to in our brief, is not binding authority on this court, is not binding authority. And it does not require the county to do anything and they haven't done anything. So to the extent this court wants to decide the issue on what the county is doing, it has every right to do so. Thank you, counsel. The case just argued will be submitted for decision. We will take a five minute recess and our wonder kind video technician will invite us into the breakout room where we will deliberate. Thank you. This court for this session stands adjourned.
judges: O'scannlain, Thomas, McKeown, Wardlaw, W. Fletcher, Clifton, Bybee, Callahan, Ikuta, Friedland, Nelson